JOHN E. MOLE *vs.* UNIVERSITY OF MASSACHUSETTS & others.[1]

No. 00-P-735.

Suffolk. March 20, 2002. - May 8, 2003.

Present: GREENBERG, LENK, & COWIN, JJ.

Further appellate review granted, 439 Mass. 1109 (2003).

*University of Massachusetts. Civil Rights,* Termination of employment. *Employment,* Discrimination, Retaliation, Termination. *Anti-Discrimination Law,* Termination of employment, Prima facie case. *Public Employment,* Termination. *Limitations, Statute of. Practice, Civil,* Prima facie case, Statute of limitations.

In a civil action brought by a tenured professor against the defendant university and individual defendants, alleging that the professor's support of his wife's sexual harassment complaint against the university inspired unlawful retaliation resulting in reductions in salary and ultimately in termination of his appointment, the judge erred in granting a motion for a directed verdict in favor of the defendants, where evidence of adverse employment actions that were unavailable as a basis for the plaintiff's claims by virtue of the applicable statutes of limitations could be used to support an inference that subsequent acts that were not time-barred were a product of discrimination, and therefore, the evidence was sufficient to permit the jury to find a causal connection between the professor's support of his wife's complaint and the subsequent adverse employment decisions. [38-47] GREENBERG, J., dissented.

In a civil action brought by a tenured professor against the defendant university and individual defendants, alleging that the professor's support of his wife's sexual harassment complaint against the university inspired unlawful retaliation resulting in reductions in salary and ultimately in termination of his appointment, the professor's administrative complaint was sufficient to satisfy the jurisdictional prerequisites of 42 U.S.C. § 2000e-3(a) (2000) and G. L. c. 151B, and the fact that the professor was subsequently subjected to a more significant effect of the allegedly unlawful retaliation did not alter the fact that the retaliation issue had been fairly placed before the Massachusetts Commission Against Discrimination [47-48]; further, the professor's claim under 42 U.S.C. § 1983 (2000) was not preempted by his claim under 42 U.S.C. § 2000e-3(a), where the professor adequately pleaded interference with his right under the First Amendment to the United States Constitution of intimate association with his wife [48].

CIVIL ACTION commenced in the Superior Court Department on August 5, 1994.

[1]Michael P. Czech, Frank J. Chlapowski, and Michael A. Bratt.

A motion for summary judgment was heard by *Barbara J. Rouse*, J., and the case was heard by *Charles T. Spurlock*, J.

*John Foskett* for the plaintiff.

*Christopher J. Campbell* for the defendants.

COWIN, J. The plaintiff, formerly a tenured professor at the University of Massachusetts Medical Center, brought proceedings against the University of Massachusetts (University) and various University employees in which he alleged that his support of his wife's sexual harassment complaint against a department head inspired unlawful retaliation resulting first in reductions in his salary, then in termination of his appointment. Following pretrial rulings that narrowed the issues (and from which there have been no appeals), the case was tried to a jury for six days. At the close of the plaintiff's case, the judge directed verdicts in favor of the defendants Michael A. Bratt and Michael P. Czech. At the close of all the evidence, the judge directed verdicts in favor of the remaining defendants Frank J. Chlapowski and the University. Following the entry of judgments in accordance with the directed verdicts, the plaintiff appealed. Applying the standard applicable to directed verdicts, see *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 488 n.14 (2000), we conclude that there was sufficient evidence both of a prima facie case and of pretext on the part of the defendants to require submission of the case to the jury, and we accordingly reverse.

1. *Prior proceedings.* On May 2, 1993, the plaintiff filed with the Massachusetts Commission Against Discrimination a complaint of unlawful retaliation for engaging in a protected activity, i.e., supporting his wife's sexual harassment complaint. Following the required waiting period, see G. L. c. 151B, § 9, the plaintiff sought relief in the Superior Court under various civil rights statutes, specifically: (1) G. L. c. 151B, §§ 4(4), 4(4A) and 4(5); (2) Title VII, 42 U.S.C. § 2000e-3(a) (2000); and (3) 42 U.S.C. § 1983 (2000). He also sued for breach of contract and declaratory relief. Each of his statutory claims was asserted against all of the defendants: Michael P. Czech, former chair of the biochemistry and molecular biology department; Frank P. Chlapowski, acting chair; Michael A. Bratt, provost of the medical center; and the University itself. A judge of the

Superior Court ruled that the "continuing violation" doctrine was inapplicable and granted summary judgment in favor of the defendants on those portions of the G. L. c. 151B claim that sought redress for conduct occurring prior to November 2, 1992 (the then applicable limitation of six months prior to the filing of the plaintiff's complaint with the Massachusetts Commission Against Discrimination).[2] Likewise, the judge granted the defendants summary judgment with respect to the plaintiff's allegations under Title VII of conduct occurring prior to September 2, 1992 (240 days prior to the filing with that commission, 42 U.S.C. § 2000e-5[5]). The judge, in addition, granted summary judgment for the University on the plaintiff's § 1983 claim, ruling that the University was not a "person" subject to liability thereunder. Finally, the judge allowed the defendants' motion for summary judgment on the plaintiff's claims for breach of contract and declaratory judgment.[3] The remaining claims went to trial, resulting in the directed verdicts in question.[4]

2. *Material facts.* "The question before us [in reviewing such a ruling] is . . . whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[].' " *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. at 488 n.14, quoting from *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 520 (1992). Therefore, we state what the jury could have found, treating the evidence, as well as the reasonable inferences therefrom, in the light most favorable to the plaintiff.

The plaintiff and his wife, Jacqueline Anderson-Mole, each the holder of a doctoral degree in biochemistry, were engaged in research at the University of Alabama at Birmingham when they accepted an offer from the defendant Czech to join the biochemistry and molecular biology department (department) at the University of Massachusetts Medical Center (medical

---

[2]In August, 2002, the Legislature amended G. L. c. 151B, § 5, to increase the limitations period to 300 days. See St. 2002, c. 223, § 1.

[3]As indicated above, there has been no appeal from these rulings.

[4]Although the plaintiff's notice of appeal includes the directed verdict in favor of the defendant Michael A. Bratt, his brief does not argue the point and we deem that portion of the appeal waived. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

center). The plaintiff joined as an associate professor, was subsequently granted tenure, and thereafter was granted a full professorship. Anderson-Mole joined the department on a non-tenure track. They brought with them valuable equipment and supplies as well as grants that they used to support their research work and salaries over the next several years. At the medical center, they founded and operated as codirectors the Protein Chemistry Core Facility (PCF), a research facility that, among other things, isolated and sequenced proteins and amino acids for other researchers at the medical center and other institutions. For several years, the PCF was funded in part by the Diabetes and Endocrinology Research Center (DERC), an organization of scientists at the medical center (of which Czech was a member), that in turn received grants awarded by the National Institutes of Health. The plaintiff also received funding from the Scientific Council, a group of scientists composed of one representative from each medical center department.

At the material times, faculty members at the medical center were evaluated on the basis of teaching, service and research. In 1983, Czech and the defendant Chlapowski, then an associate professor, gave the plaintiff's teaching strongly positive evaluations. In recommending tenure for the plaintiff with "great enthusiasm," Czech referred to him as an "exceptionally talented faculty member" and a "truly distinguished investigator," and remarked on his "solid teaching performance," "well respected research program," and "outstanding service" as PCF director. Following these reviews, the plaintiff was granted tenure in 1984. He was elevated to the rank of full professor in 1987, again following enthusiastic recommendations by Czech and Chlapowski and a unanimous vote by the department's personnel action committee.[5]

Between 1981 and 1989, the plaintiff's salary was consistently increased; he was appointed to various department committees by Czech, who confirmed that he was active and productive thereon; and he received no negative faculty evaluations regard-

[5]Czech explained away some negative student evaluations of the plaintiff's teaching by explaining that the plaintiff was responsible for certain lectures in the medical biochemistry course on subject matter that was not appealing to students, but that his lectures were effective.

ing his performance. By 1989, the plaintiff carried the second highest teaching load in the department.[6] In that year, Czech took a leave of absence from the position of chair of the department, his duties being assumed by Chlapowski in an acting capacity. Although on leave as chair, Czech continued to participate in faculty evaluations.

During budget hearings in 1989, the Scientific Council discussed a proposal to save money by merging the plaintiff's PCF with a neighboring peptide synthesis core facility. Various concerns regarding the operations of the PCF, including alleged difficulties encountered in working with the plaintiff, were expressed. A subcommittee was appointed to investigate and make a recommendation regarding continued funding of the PCF. On February 8, 1990, the subcommittee recommended consolidation of the two laboratories and a public search for a new director of the combined facility.

On February 28, 1990, Anderson-Mole submitted to James Wells, the medical center's equal employment opportunity compliance officer, an informal complaint of sexual harassment against Czech.[7] The plaintiff supported[8] his wife's complaint. During that academic year (September, 1989, to June, 1990), the plaintiff was relieved of the majority of his teaching duties, the stated reason for which was the need to give younger faculty members teaching experience. During the summer of 1990, both the plaintiff and Anderson-Mole sought appointment as head of the new combined PCF-peptide synthesis core facility. Neither was a finalist for the position. In August, 1990, Aaron Lazare, then chancellor of the medical center, informed Czech that a

[6]The plaintiff's otherwise unbroken sequence of successes between 1981 and 1989 was marred by a single incident in 1988 when Czech questioned the plaintiff's practice of charging his colleagues for use of his personal high performance liquid chromatograph, and the plaintiff and Anderson-Mole threatened Czech with a formal grievance. The dispute was resolved informally.

[7]Anderson-Mole's complaint apparently arose as a result of alleged comments or jokes by Czech that she considered inappropriate.

[8]The record is unclear as to precisely what the plaintiff's "support" consisted of, although it appears that he made it known to the defendants that he believed that his wife's charges were accurate and that he would assist her in pursuing them. In any event, the defendants do not contest in this appeal that a protected activity was involved.

female faculty member had submitted an informal complaint of sexual harassment against him. There was some evidence that, at the time, Anderson-Mole was the only female faculty member of the department. Czech informed Chlapowski of the complaint, also indicating to Chlapowski that Czech was already aware of a rumor that such a complaint existed (notwithstanding that complaints of this nature were understood to be confidential).

On October 4, 1990, the plaintiff received, for the first time, a negative performance evaluation for the period July, 1989, to June, 1990, signed by Czech and Chlapowski. The evaluation reported that the plaintiff had been relieved of certain teaching assignments because of "consistently negative oral and written evaluations of his teaching efforts" by students. In addition, Chlapowski, in his capacity as acting department chair, now refused to appoint the plaintiff to membership on any department committees, despite the fact that the plaintiff asked to be included. By December, 1990, relations between the plaintiff and other faculty truly began to disintegrate, with the plaintiff, in the course of a faculty meeting, attacking Chlapowski's credentials and performance as acting chair and referring to him as "Czech's stooge."

In January, 1991, Anderson-Mole, again with the plaintiff's support, filed with the equal employment opportunity compliance officer a formal charge of sexual harassment against Czech.[9] Despite the confidentiality that normally attends such complaints, the officer informed Chlapowski that Anderson-Mole had filed a formal charge of sexual and professional harassment. Chlapowski erroneously believed that the charge had been leveled at himself, subsequently refusing to accept the plaintiff's statement that the charge was directed at Czech only. By early 1991, Czech also learned that the formal complaint had been submitted.

On April 24, 1991, Chlapowski filed a formal charge of scientific misconduct against the plaintiff. This arose following the negative evaluation of the plaintiff dated October 4, 1990,

---

[9]She subsequently pursued the claim in court. A jury found in favor of the defendants. This court affirmed. See *Anderson-Mole* v. *University of Mass.*, 49 Mass. App. Ct. 723 (2000). The sole issue on appeal involved jury selection. *Id.* at 724-726.

when the plaintiff requested that Chlapowski review certain of the plaintiff's publications for which the plaintiff believed he had not received due credit. The review disclosed six papers listed by the plaintiff as "accepted for publication" or "in press" that had not subsequently been published, as well as articles that the plaintiff had coauthored that were published but that he had failed to list. Following normal medical center procedures, the associate dean of scientific affairs convened an investigating panel that concluded that, while the plaintiff's conduct had been "sloppy and inappropriate," no scientific misconduct had occurred. While most of the data contained in the six articles in question did get published, the associate dean officially reprimanded the plaintiff for "repeated inappropriate reporting of scientific achievements."

In May, 1991, the DERC voted to discontinue funding of the PCF effective December 1, 1991.[10] The plaintiff had attempted to rebut various grounds on which the decision was apparently based, but to no avail. On May 29, 1991, Chlapowski wrote to the Scientific Council, another funding source for the PCF, requesting that the council[11] "officially come to closure with regard to the relationship of [the plaintiff]" and that it do so "as soon as possible." In June, 1991, the council voted to discontinue all funding for the PCF.[12] On July 8, 1991, the plaintiff wrote to Chlapowski requesting department funding for the PCF. Chlapowski requested both a formal application and written answers to a number of questions regarding the PCF. Alleging that responses would require countless hours gathering information within and outside the medical center, and that Chlapowski had given no assurance that the application would be approved, the plaintiff did not pursue the request.

---

[10]Czech's participation with respect to this vote is unclear. Minutes of the DERC meeting indicate that Czech recommended that the funding be cut. However, there was other evidence that Czech, while present at the meeting, did not participate in the discussion on the issue and was not present when the vote was taken.

[11]Neither Czech nor Chlapowski were members of the Scientific Council.

[12]The Scientific Council's subcommittee had earlier recommended that the PCF and the peptide synthesis core facility be consolidated and that a new director of the combined facility be appointed. There also exists evidence that the Scientific Council may have withdrawn funding earlier, but we are unable to resolve the evidentiary question here.

In August, 1991, the medical center informed Anderson-Mole that her contract for the 1991-1992 academic year would be her last. Furthermore, Chlapowski informed Anderson-Mole that, upon the expiration of her contract, she was not to enter the plaintiff's laboratory or, for that matter, the premises of the medical center in general. In addition, Chlapowski demanded that, during the final year of the contract, the plaintiff pay one hundred percent of Anderson-Mole's salary, as well as her accrued vacation time, rather than the eighty percent that he had previously paid (the department bearing the remaining twenty percent). The plaintiff filed a grievance on the salary issue and prevailed.

By the end of November, 1991, the plaintiff's funding had been completely eliminated. On December 13, 1991, Czech and Chlapowski issued another negative evaluation of the plaintiff's performance, this time for the period July, 1990, to June, 1991, in which they expressed a lack of comprehension as to how the plaintiff could remain as a faculty member.

In January, 1992, Chlapowski refused to approve the plaintiff's application for a grant from the Alzheimer's Foundation. The reasons for the refusal are disputed, although the plaintiff suggests that Chlapowski's stated reason was pretextual. Throughout 1992 and early 1993, Chlapowski demanded that the plaintiff contract his research activities from the three laboratory rooms that he had previously enjoyed into a single laboratory room. Despite the plaintiff's request that the change be delayed until completion of his grievance on the subject, the change was implemented.[13]

On February 10, 1993, Chlapowski submitted an even more negative performance appraisal of the plaintiff for the period July, 1991, to June, 1992. In the evaluation, he recommended that, absent significant improvements in productivity, the plaintiff's salary be reduced by 17.5 percent in the year thereafter. He also stated that the plaintiff had filed no grant ap-

---

[13]Testimony regarding the contraction of the space was conflicting. There was evidence that the plaintiff had, prior to the change, been assigned space that was greater than that given his peers, and that such space was not required for his research activities. There was also evidence that the space taken from him remained vacant for one to two years.

plications, an observation that the plaintiff contested. Czech did not sign this evaluation, and claims that he did not participate in the review. However, the review incorporated by reference the previous year's review on which Czech did collaborate. In addition, it employed plural references ("we continue to be deeply concerned;" "our conclusion remains the same"), suggesting that Chlapowski intended to reflect Czech's opinion as well as his own.

On May 2, 1993, the plaintiff filed a complaint with the Massachusetts Commission Against Discrimination alleging that the defendants retaliated against him because of his support of his wife's sexual harassment charge. This filing also served as a filing with the United States Equal Employment Opportunity Commission.

The plaintiff also filed a grievance, claiming that it was a conflict of interest for Chlapowski to evaluate him. At the request of the grievance committee, Chlapowski withdrew from the evaluation process and a three-member, ad hoc personnel action committee was appointed to conduct future evaluations of the plaintiff. Although the plaintiff was entitled to select one member of the ad hoc committee, with that member joining in the selection of the third, he declined to make a choice. The department members then selected two of their number to serve, with those two choosing a third. As so constituted, the ad hoc committee included Dr. Thomas Miller, a close friend of Chlapowski who had had a recent conflict with the plaintiff.

The ad hoc committee conducted three evaluations of the plaintiff. In its report of June 9, 1994, for the period July 1, 1992, to April 1, 1994, the committee accused the plaintiff of being deliberately unproductive, having performed no research and making no genuine attempts to obtain funding. It voted to reduce his annual salary by 17.5 percent, recommended that his laboratory space be taken away entirely, and threatened him with an additional 17.5 percent reduction the following year if his performance did not improve. In its 1995 report for the period April 1, 1994, to March 31, 1995, the committee in fact reduced the plaintiff's salary by a second 17.5 percent. The committee evaluated the plaintiff a final time on July 10, 1996,

for the period April 1, 1995, and following, and then resigned, stating that it was a waste of time to evaluate someone who was not doing anything.[14]

In 1996, Edward Bresnick, a vice chancellor for research who had succeeded to the position of the plaintiff's evaluator, requested that Chlapowski document his concerns about the plaintiff. By letter dated August 21, 1996, Chlapowski accused the plaintiff of a complete lack of productivity, "incorrigible and unethical" behavior, and the improper use of his university computer for personal matters. In 1997, medical center Chancellor Aaron Lazare commenced termination proceedings against the plaintiff. Czech and Chlapowski gave information used by the University in connection with these proceedings, and in 1998, they testified at the hearings. After the hearings concluded, Lazare requested that Czech review a transcript of the plaintiff's testimony. On February 5, 1999, Czech wrote to Lazare, discrediting the plaintiff's testimony and claiming that he had received tenure under "false pretenses." Ultimately, the University's board of trustees, acting on Lazare's recommendation, voted to terminate the plaintiff's appointment effective May 5, 1999.

3. *Sufficiency of the evidence (G. L. c. 151B and Title VII claims).* At the outset, we observe that this case, one that had been fully tried and that represented at least an arguable case for the plaintiff, should have been submitted to the jury as a matter of judicial economy. "[T]he better procedure in a case in which it is a close question whether the standard for granting a directed verdict is met is to allow the matter to go to the jury. If the judge then decides that the jury's verdict cannot stand, a motion for judgment notwithstanding the verdict may be allowed." *McAllister* v. *Boston Hous. Authy.*, 429 Mass. 300, 301 (1999), quoting from *Smith* v. *Ariens Co.*, 375 Mass. 620, 627 (1978). Had this case gone to the jury, and had there been a verdict for the defendants, inquiry into the sufficiency of the

---

[14]The plaintiff submitted one grant application in 1992, none in 1993, and two in 1994, although the latter two proposals contained language that guaranteed their rejection. He submitted no grant applications and published no articles between 1995 and the time of trial in 1999.

evidence would be unnecessary. Instead, given the result herein, the case must be retried.

The plaintiff asserts that the defendants retaliated against him with respect to his employment because of his support of his wife's complaint alleging sexual harassment on the part of their department head. Such retaliation is rendered unlawful both by G. L. c. 151B, § 4(4), and by Title VII, 42 U.S.C. § 2000e-3. To prevail where, as here, there is "no direct evidence of retaliatory animus," the plaintiff must both establish a prima facie case and prove that the defendants' stated reasons for the employment action were pretextual. *McMillan* v. *Massachusetts Soc. for the Prevention of Cruelty to Animals*, 140 F.3d 288, 309 (1st Cir. 1998), cert. denied, 525 U.S. 1104 (1999). This burden applies both in Federal and in Massachusetts proceedings. *Ibid.* While the burden of persuasion rests at all times with the plaintiff, the shifting burden of production in a retaliation case follows the tripartite formula of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-805 (1973). See *Ramos* v. *Roche Products, Inc.*, 936 F.2d 43, 47 (1st Cir.), cert. denied, 502 U.S. 941 (1991). Thus, the plaintiff must present a prima facie case; the defendants must "articulate some legitimate, nondiscriminatory reason for the employee's rejection," *McDonnell Douglas Corp.* v. *Green*, *supra* at 802; and, should the defendant satisfy that burden of production, the plaintiff must prove that the articulated reason is a pretext, *id.* at 805. If the fact finder determines that one or more of the defendants' reasons is false, "it may (but need not) infer that the [defendants are] covering up a discriminatory intent, motive or state of mind." *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 501 (2001).

The judge concluded that the plaintiff's efforts misfired at the first *McDonnell Douglas* stage in that the plaintiff failed to establish a prima facie case. To establish a prima facie case of retaliation, a plaintiff must show that he engaged in legally protected conduct; he suffered an adverse employment action; and a causal connection existed between the protected conduct and the adverse action. *McMillan* v. *Massachusetts Soc. for the*

*Prevention of Cruelty to Animals*, 140 F.3d at 309.[15] The defendants assert that the judge correctly spotted the absence of a causative link between the plaintiff's support of his wife's complaint and the subsequent adverse employment decisions. They argue further that, even if it is held that the plaintiff succeeded in establishing a prima facie case, there was insufficient evidence that the reasons given for the adverse actions were pretextual.

We observe that the defendants expend no ammunition on the first two aspects of the prima facie case. General Laws c. 151B, § 4(4), inserted by St. 1946, c. 368, § 4, declares that it is an unlawful practice for an employer "to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter." The plaintiff's support of his wife's sexual harassment complaint was a protected activity, thereby satisfying the first requirement of a prima facie case. Likewise, it is hard to quibble with the proposition that the plaintiff suffered adverse job actions within the limitations period, including the negative evaluations, the contraction of his laboratory space, salary reductions totaling thirty-five percent over two years, and ultimately termination of his appointment as tenured professor. Accordingly, there was a case for the jury on the second aspect of the prima facie case.

The issue whether there was a relationship between the plaintiff's protected activity and the adverse employment actions is complicated by the fact that the negative treatment experienced by the plaintiff from 1990 to September 2, 1992 (Title VII), or to November 2, 1992 (G. L. c. 151B),[16] is unavailable as a basis for the plaintiff's claims by virtue of the respective statutes of limitations. However, while the plaintiff may not obtain damages or other relief for these actions, evidence regarding them may be used to support an inference that subsequent acts that are not time-barred were a product of discrimination. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 530 n.10 (2001); *Sabree* v. *United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 400 n.9 (1st Cir. 1990).

---

[15]The burden of showing causation at the prima facie case stage has been characterized as less onerous than the ultimate burden. See *Gee* v. *Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

[16]See note 2, *supra*.

We acknowledge that, to satisfy the causation requirement of the prima facie case, there must be more than a sequence of protected activity, knowledge thereof on the part of the employer or its agents, and action adverse to the employee. The defendants argue, and the dissent agrees, that the plaintiff offered no evidence of retaliation other than the fact that Czech and Chlapowski knew of his wife's complaint before their involvement in some of the adverse actions against him. See *post* at 51. This ignores the key evidence that the postcomplaint statements and actions of Czech and Chlapowski directly conflicted in the most dramatic way with their precomplaint statements and actions.

From 1981, when Czech recruited the plaintiff to join the medical center faculty, to 1989, Czech treated the plaintiff as a valuable asset to the school in all of the areas deemed important for purposes of faculty evaluations: i.e., teaching, service and research. In instances when criticism of the plaintiff surfaced at all, such as some negative student opinions of his teaching, Czech, without exception, justified the plaintiff's position on the subjects. Recognizing that in 1989 the Scientific Council commenced consideration of criticisms of the performance of the PCF under the plaintiff's leadership, it was for the jury to determine whether any failures on the plaintiff's part played a role in the subsequent actions of Czech and Chlapowski.

Anderson-Mole's informal complaint to the equal employment opportunity officer took place on February 28, 1990, and the jury could have found that both Czech and Chlapowski knew of it. Thereafter, the following events occurred. The plaintiff was relieved of a majority of his teaching responsibilities, a process that had begun earlier but that continued thereafter. Both the plaintiff and his wife were passed over for appointment as director of a new combined PCF-peptide synthesis core facility. On October 4, 1990, Czech and Chlapowski filed their first negative evaluation of the plaintiff. The evaluation attributed the plaintiff's reduction of teaching assignments to "consistently negative oral and written evaluations of his teaching efforts" by his students, this notwithstanding Czech's earlier rationalization that the negative views of some students were attributable to the subject matter, and despite

prior statements that the plaintiff's teaching load had been reduced in order to give younger faculty members teaching opportunities. Chlapowski, now acting department head, then refused to appoint the plaintiff to any department committees.

Anderson-Mole filed her formal complaint in January, 1991. The jury could have found that Czech knew of the complaint and the plaintiff's support of it, as well as that Chlapowski erroneously believed that he was also a target. Subsequently, Chlapowski filed a formal charge of scientific misconduct against the plaintiff, a charge eventually resulting in a determination that scientific misconduct had not occurred. In the month following the filing of that charge, the DERC, of which Czech was an executive committee member, voted to discontinue funding of the PCF. Two months later, Chlapowski urged the Scientific Council to act as soon as possible with respect to its funding of the PCF, and the council responded by terminating that funding. The jury could have found that Chlapowski then stonewalled the plaintiff's request for department funding. In August, 1991, the department informed Anderson-Mole that her contract would not be renewed after the forthcoming academic year. In a related effort, Chlapowski unsuccessfully sought to have the plaintiff bear the portion of his wife's salary that previously had been the responsibility of the medical center department. In December, 1991, Czech and Chlapowski rendered another, even more negative, report on the plaintiff's performance. In January, 1992, Chlapowski refused to approve the plaintiff's application for an Alzheimer's Foundation grant. In 1992, Chlapowski commenced his campaign to reduce the plaintiff's research space.[17]

The jury could have concluded that the above actions by the

_____

[17]The dissent suggests that we have "skirt[ed] the temporal issue," see *post* at 51 n.2, observing that more than two years passed between the wife's formal complaint and the first negative evaluation that is not time-barred, and that nine years elapsed between her initial informal complaint and the plaintiff's termination. This does not do justice to the evidence. Adverse actions by Czech and Chlapowski commenced in 1990, the year of the informal complaint, and continued. That some of them are time-barred does not mean that they are not evidence of subsequent discrimination that is not time-barred. While the final adverse action took place in 1999, the jury could have permissibly found that a variety of adverse actions attributable to Czech and Chlapowski occurred between 1990 and 1999.

defendants, specifically those activities that occurred prior to the actions that are not time-barred, were motivated principally by good faith, academically centered views that the plaintiff's contributions were less valuable than they might have been in the past, or that the worth of his past contributions had been exaggerated, and that his productivity did not compensate for the perceived difficulties in dealing with him. If so, it is irrelevant whether the defendants' opinions regarding the plaintiff's performance were objectively accurate. On the other hand, the jury would also have been warranted in finding that the defendants did not act on what they perceived to be the merits, but rather that they used their positions of authority to retaliate for the plaintiff's support of his wife's sexual harassment complaints. Such a finding would not be based merely on evidence of a sequence in which protected activity is followed by knowledge on the part of the defendants followed by adverse employment actions. It would be based on the character and intensity of the actions, their objective merit (because lack of merit may be evidence of bad faith), their immediacy following the defendants' learning of the protected activity, and the depth of the discrepancy between the defendants' precomplaint views of the plaintiff's performance and their opinions postcomplaint. The jury should have been given an opportunity to choose between these alternatives.

Were the jury to choose the latter alternative, i.e., that the employment actions prior to September 2, 1992, were undertaken in retaliation for the plaintiff's protected activities, the question then becomes whether the unlawfully motivated time-barred acts had a sufficient effect on the acts within the limitations period to permit the jury to conclude that those later acts still bore the imprint of the earlier efforts to retaliate. The defendants argue that the acts for which the plaintiff may seek relief are too remote in time from the allegedly unlawful prior acts, and are also the product of independent decision makers whose actions were not influenced by Czech or Chlapowski.

With respect to the asserted remoteness in time, we observe that the first of the actionable negative employment actions occurred in February, 1993, within a year of earlier actions that the jury could have found to be discriminatory, when

Chlapowski submitted an evaluation recommending major salary cuts should there not be significant improvement in the plaintiff's performance. The report incorporated a previous report coauthored by Czech, and the jury could have found that Czech was a sponsor of the 1993 opinions as well. This evaluation alone, if motivated by retaliatory sentiments, would, in our view, be sufficient to make out a case under both Federal and State law.

The plaintiff's spiral downward continued through the unfavorable evaluations of the personnel action committee in 1994, 1995, and 1996; the implementation of a thirty-five percent salary reduction between 1994 and 1996; Chlapowski's written attack on his productivity in August, 1996; the commencement of termination proceedings in 1997; adverse testimony by Czech and Chlapowski in 1998; and, in 1999, Czech's report discrediting the plaintiff's testimony during the termination hearings and accusing him of obtaining tenure under false pretenses, followed by the termination of the plaintiff's appointment. The defendants point to the independence of the personnel action committee, Lazare, and the University board of trustees to make the case that the unfavorable evaluations of 1994-1996, the salary reductions, and the termination could not have been products of the actions of Czech and Chlapowski.

That conclusion is far from unavoidable. We are mindful of the proposition that an adverse employment action brought about by a decision maker who arrives independently at the result unaffected by the unlawful acts or attitudes of others cannot, without more, be deemed to satisfy the "causation" requirement of a prima facie case. Nor do we rely on the so-called "cat's paw" theory, see, for example, *Willis* v. *Marion County Auditor's Office*, 118 F.3d 542, 547-548 (7th Cir. 1997), applicable where the nominally independent decision maker is influenced by others with a discriminatory animus and adopts their views with no exercise of independent judgment. Here, while there was evidence that Czech and Chlapowski had some influence on subsequent decisions by others, particularly with respect to the termination proceedings in 1998 and 1999, the jury could have found that the personnel action committee, Lazare, and the University board of trustees operated independently of these defendants.

That, however, does not dispose of the question. Here, the jury could have decided that unlawfully motivated actions of Czech and Chlapowski between 1990 and 1993 so affected the plaintiff's position at the medical center that they rendered the adverse decisions by others between 1994 and 1999 inevitable. Again, that conclusion was certainly not required, but it was permissible. By 1993, the defendants had eliminated all of the plaintiff's teaching assignments as well as his memberships on department committees. Because funding for the PCF had also been taken away, it was impossible for the plaintiff to achieve anything in the areas of teaching or service, two of the three categories in which medical center faculty members are evaluated. Likewise, the defendants recommended, then implemented, a reduction in the plaintiff's laboratory space; his wife's contract was not renewed; and the defendants refused to support further funding for his research, either from prior sources or from new ones. Thus, his chance of maintaining his position through effective research was effectively hobbled. Having eviscerated his opportunities in all of the areas that counted at the medical center, the defendants then declared him "unproductive" and withdrew, at least officially, from the evaluation process. Arguably, at some point in the process, the plaintiff's unhappy future became preordained.

Were these facts found by the jury, and on this record they could have been so found, we conclude that the causation prong of the prima facie case was established. If the defendants' actions, motivated by discriminatory intent, left the plaintiff in a position where he was helpless to alter circumstances that led subsequently to adverse employment decisions by others, then the defendants' unlawful actions were the cause of those subsequent decisions. Antidiscrimination laws would have little vigor if they were held not to reach such an outcome. See *Lynn Teachers Union, Local 1037* v. *Massachusetts Commn. Against Discrimination*, 406 Mass. 515, 520-523 (1990), rejecting the more restrictive interpretation under Title VII of *United Air Lines, Inc.* v. *Evans*, 431 U.S. 553 (1977). Certainly, the evidence indicates that the plaintiff did not exactly cover himself with glory from 1992 forward; but it was for the jury to unravel the relationship between the activities of Czech and Chlapowski,

the plaintiff's lack of productivity, and the adverse employment decisions of 1994 to 1999.

What we have said above on the sufficiency of the prima facie case applies with equal force to the requirement that the plaintiff demonstrate that the defendants' asserted lawful reasons for the adverse employment actions were pretextual. The plaintiff has the burden of persuasion on this point. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997). For the reasons stated, the jury could have found that the putatively independent decisions by subsequent decision makers were the inevitable product of the defendants' earlier unlawful retaliatory activities. If so, the proposition that these subsequent decisions were wholly on the merits and unaffected by the prior illegalities was a transparent pretext, and the jury could have so concluded.

The defendants press the contention that *DeNovellis* v. *Shalala*, 124 F.3d 298 (1st Cir. 1997), protects them from liability on the above-described theory. We do not read *DeNovellis* so broadly.[18] There, the plaintiff, having presented evidence sufficient to warrant a finding that prior to 1991 he had been given sham work assignments beneath his level of competence because of a discriminatory motivation on the part of his supervisor, sought recovery under the post-1991 version of Title VII (allowing for far more generous remedies) on the theory that the effects of the pre-1991 discrimination continued into the post-1991 period. Both the Federal trial level and appellate courts concluded that there had been no separate act of discrimination during the post-1991 period because the reasons for the plaintiff's post-1991 assignments "were neither analogous nor part of the same pattern or series. There is precious little evidence or inference to get to a trier of fact on discriminatory motive for post-[1991] employment decisions." *DeNovellis* v. *Shalala, supra* at 308. In other words, while the plaintiff may still experience the effect of a past, time-barred

---

[18]Even if the *DeNovellis* case had the effect urged by the defendants, it would of course govern only the case under Title VII, and would have no binding effect on interpretations of G. L. c. 151B. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 163 (1987).

discriminatory act, in the absence of a new discriminatory act that causes him harm there is no cause of action.

By contrast, in the present case, the acts of the personnel action committee, the chancellor, and the trustees between 1994 and 1999 independently caused harm to the plaintiff. That harm consisted of salary reductions and termination, not merely continuation of existing treatment. We view the case as more closely governed by *Thomas* v. *Eastman Kodak Co.*, 183 F.3d 38 (1st Cir. 1999), cert. denied, 528 U.S. 1161 (2000), decided subsequent to *DeNovellis*. In *Thomas*, the plaintiff presented sufficient evidence that she was victimized by racially motivated, but time-barred, performance appraisals. Those appraisals were used subsequently by others, themselves without bias, as a basis for a layoff of the plaintiff during a personnel reduction. Stating that "it seems unlikely that Title VII permits employers to take a new employment action such as a layoff which first causes an employee harm, as long as the allegedly discriminatory evaluations on which the layoff is based were conducted more than three hundred days earlier," *id.* at 48, the court concluded that "Title VII extends to a neutral employer decision-making process that relies on discriminatory evaluations." *Id.* at 50. While the *Thomas* decision dealt with the character of the event for the purpose of determining when the limitations period commenced, the unavoidable product of the analysis is that the time-barred discriminatory act may inform a later, presumptively neutral act in a way that renders the subsequent act also discriminatory. See *Lynn Teachers Union, Local 1037* v. *Massachusetts Commn. Against Discrimination*, 406 Mass. at 520-523. There was such evidence here, and it was sufficient to go to the jury.

4. *Other issues.* We address briefly certain other issues raised by the defendants. The plaintiff's administrative complaint in 1993 was sufficient to satisfy the jurisdictional prerequisites of Title VII and G. L. c. 151B with respect to the 1999 termination. The scope of subsequent court proceedings is limited by the charge filed with the administrative agency and the administrative investigation that can reasonably be expected as a result. *Lattimore* v. *Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996). The plaintiff complained to the Massachusetts Commission

Against Discrimination of unlawful retaliation that adversely affected his employment. That he was subsequently subjected to a more significant effect, i.e, termination, does not alter the fact that the retaliation issue was fairly placed before the agency.

Finally, we conclude that the plaintiff's claim under 42 U.S.C. § 1983 is sufficiently viable to be included in the event of a retrial. Contrary to the defendants' characterization, the plaintiff adequately pleaded interference with his right under the First Amendment to the United States Constitution of intimate association with his wife by means of retaliation against *him*, not merely because of the defendants' refusal to renew his wife's contract. See *Adler* v. *Pataki*, 185 F.3d 35 (2d Cir. 1999). The great weight of authority appears to hold that a § 1983 claim is not preempted by Title VII when the § 1983 complaint alleges violation of a separate constitutional or statutory right. See *Johnston* v. *Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989), cert. denied, 493 U.S. 1019 (1990); *Jackson* v. *Atlanta*, 73 F.3d 60, 63 n.13 (5th Cir.), cert. denied, 519 U.S. 818 (1996). This applies even where, as here, the § 1983 and Title VII claims rely on the same factual allegations.

*Judgment reversed.*

*Case remanded for new trial.*

GREENBERG, J. (dissenting). I share the majority's lament that had the trial judge submitted this case to the jury, especially after a long and bitterly contested trial, scarce judicial resources would have been spared given the majority's view of the matter. Even so, I believe that the trial judge, having presided over the trial and heard all of the testimony from the lips of the witnesses, correctly concluded that the plaintiff failed to establish a causal link between the various adverse employment actions and the plaintiff's support of his wife's ill-fated sexual harassment claim.[1]

We have emphasized that the presence of retaliation is largely

---

[1]The plaintiff's wife subsequently pursued her claims in court. A jury ultimately found in favor of the defendants with respect to her sexual harass-

a question of fact; however, "in a matter such as this the very concept of unlawful retaliation contains significant legal elements, and it may not be simply relegated to jury determination as a purely factual matter without guidance or definition." *Bain* v. *Springfield*, 424 Mass. 758, 765 (1997).

The majority emphasizes that the plaintiff was a stellar performer on the faculty of the biochemistry and molecular biology department (department) of the University of Massachusetts Medical Center (medical center) prior to supporting his wife's sexual discrimination claim in 1991 and that, as a result, his standing plummeted. From that circumstance, the majority concludes that a jury question arose with respect to retaliatory causation. A close reading of the record suggests otherwise. In the late 1980's, the medical center's Scientific Council formed a subcommittee to evaluate the plaintiff's Protein Chemistry Core Facility (laboratory). Professor Alan Jacobson, who served on the council, testified that the subcommittee was concerned with the quality of work performed at the laboratory and elaborated on the reasons for that negative report. The bottom line was that a recommendation was made to replace the plaintiff with a new director rather than continue under his stewardship. That recommendation was made to the Scientific Council by its subcommittee on February 8, 1990.

Twenty days after learning of the recommendation of the Scientific Council's subcommittee, which combined the plaintiff's laboratory with another laboratory, the plaintiff's wife approached the medical center's equal employment officer with her complaint regarding sexual harassment. The other funding unit for the laboratory, the Diabetes and Endocrinology Research Center, had concerns similar to those of the subcommittee prior to January, 1991, and based upon those preexistent complaints about the plaintiff's leadership, voted to withdraw funding from his laboratory in May, 1991.

With respect to the plaintiff's teaching function, following the academic year 1989-1990, the defendant Frank Chlapowski, as interim department chair, removed the plaintiff from teaching duties based on negative reports called to his attention by

ment claims. This court affirmed the judgment. See *Anderson-Mole* v. *University of Mass.*, 49 Mass. App. Ct. 723 (2000).

Professor Reid Gilmore, the graduate course coordinator. Gilmore informed them, and testified at trial, that the plaintiff was ranked "fair to poor" by the students, whereas other teachers in the course were rated "good to excellent."

The record evidence also shows that members of the department did not want the plaintiff representing them because he had alienated members of the department through his conduct — at one point verbally attacking Chlapowski at a December, 1990, department meeting and asserting that he was not capable of chairing the department.

All of this evidence stands in contrast to the majority's view that the various adverse acts happened subsequent to engaging in protected activity. I realize that the question before us in reviewing the Superior Court's ruling is whether there exists anywhere in the evidence, from whatever source derived, any combination of circumstances from which a reasonable inference could be drawn in favor of the plaintiff. *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 520 (1992). As noted by the United States Court of Appeals for the First Circuit in *Mesnick* v. *General Elec. Co.*, 950 F.2d 816, 824-825 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992), in the discrimination context, courts confronted by summary judgment motions must at this point focus on the ultimate question, scrapping the burden shifting framework in favor of considering the evidence as a whole. See also *Williams* v. *Cerberonics, Inc.*, 871 F.2d 452, 458-459 (4th Cir. 1989). The problem in the instant case, however, is that there is no evidence in the record, other than what the majority characterizes as a "spiral downward," *ante* at 44, which specifies the plaintiff's ultimate burden of proof of retaliation. "Whatever the sources of his proof, a plaintiff, in order to survive judgment as a matter of law, must present evidence from which a reasonable jury could infer that the employer retaliated against him for engaging in [protected] activity." *Mesnick* v. *General Elec. Co.*, 950 F.2d at 828. For instance, in *Sattar* v. *Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998), the court agreed that the plaintiff established its initial burden, but failed to meet its ultimate burden where, as here, there was reliance on a "cat's paw" theory of liability. If

one takes into account the uncontested evidence that the plaintiff's performance was unsatisfactory prior to his engaging in the protected activity, the inferential basis for the majority's view evaporates.

The plaintiff's claim also fails because he offered no evidence to support his theory of retaliation other than the fact that defendants Michael Czech and Chlapowski knew about his wife's complaint before their alleged adverse actions against him. The coincidence of timing or "[t]he mere fact that one event followed another is not sufficient to make out a causal link." *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 662 n.11 (1996). See *Hoeppner* v. *Crotched Mountain Rehabilitation Ctr., Inc.*, 31 F.3d 9, 14-15 (1st Cir. 1994) (conclusory allegation of retaliation unsupported by specific facts insufficient).[2]

At a bench conference on the last day of trial, the judge pressed plaintiff's counsel to cite evidence linking the plaintiff's problems to the sexual harassment complaint. Counsel replied, "I think that's a reasonable inference to draw because nothing happened for nine years until he found out about it. That's the only way I can do it is by reasonable inference. . . . All I can say is it was going fine and then something happened. And the something that happened was [the] sexual harassment complaint, because there is nothing else." This is simply not enough. See *Lewis* v. *Gillette Co.*, 22 F.3d 22, 25 & n.2 (1st Cir. 1994). If knowledge of a discrimination claim preceding an adverse action, itself, could support an inference of causation, then all cases in which employers knew about the discrimination claim would survive a directed verdict challenge based on causation.

---

[2]The majority skirts the temporal issue by characterizing the first negative evaluation that is not time-barred, in February, 1993, as close in time to the plaintiff's wife's sexual harassment filing in January, 1991. I read the cases on this point differently. See *Cooper* v. *North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (mere fact that bus driver was discharged four months after she filed discrimination claim was insufficient to support inference of retaliation); *Figgous* v. *Allied/Bendix Corp., Allied-Signal*, 906 F.2d 360, 362 (8th Cir. 1990) (discharge of employee approximately one year after he filed administrative charge of discrimination was too remote in time to create inference of retaliatory motive); *Morgan* v. *Musselwhite*, 101 N.C. App. 390, 393 (1991) (holding that two-year delay between plaintiff's filing of worker's compensation claim and subsequent termination from employment was insufficient to establish prima facie case of retaliation).

They do not. See, e.g., *McMillan* v. *Massachusetts Soc. for the Prevention of Cruelty to Animals*, 140 F.3d 288, 309 (1st Cir. 1998), cert. denied, 525 U.S. 1104 (1999). In addition, "[w]ere the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint." *Mesnick* v. *General Elec. Co.*, 950 F.2d at 828.

The record does not warrant an inference of connection between the adverse employment actions and the plaintiff's support of his wife's complaint. Disregarding the defendants' evidence (that the adverse actions were taken solely in response to the plaintiff's startlingly poor work ethic) leaves a record bereft of any evidence on the subject of causation at all. The plaintiff had an opportunity to cross-examine two members of the ad hoc committee, Professors Thomas Miller and Reid Gilmore, regarding their decision-making process but elected not to do so. Rather, the plaintiff attempted to establish their animus towards him, based on the fact that Miller and the plaintiff previously had clashed over the plaintiff's "wasting [Miller's] laboratory staff's time" asking them questions about another grievance that the plaintiff had filed, and on the fact that Gilmore previously had signed a November 8, 1993, letter with eight other faculty members seeking the plaintiff's removal for being "deliberately unproductive" and for misrepresenting his publication record. Even assuming a jury believed that Miller and Gilmore disliked the plaintiff on these accounts, there was no testimony or other evidence linking their recommendations to the plaintiff's support of his wife's claim.

The evidence also failed to establish any connection between the protected activity and medical center Chancellor Aaron Lazare's recommendation to the University of Massachusetts's board of trustees that the plaintiff be terminated, eight years later in May, 1998. Lazare testified he made the recommendation that the plaintiff be terminated because he was performing no work, and his contentious nature hampered Lazare's at-

tempts to recruit a chairperson for the department.[3] As with the testimony of Gilmore and Miller, Lazare's testimony provided no evidence that he considered the plaintiff's support of his wife's harassment claim when Lazare recommended the plaintiff's discharge.

Despite the fact that Lazare was the *sole witness* at trial who addressed his discharge, the plaintiff asked Lazare only one question — whether there was a medical center procedure to insure that there would be no retaliation when a low-level employee makes a complaint about her supervisor. The plaintiff failed to refute or even to explore the facts and circumstances that led to Lazare's recommendation to discharge him. Once again, there is simply no evidence linking Lazare's recommendation to the plaintiff's support of his wife's claim.

Two learned commentators have phrased it as follows: "Comments by coworkers, sworn statements from the plaintiff, and the timing of the adverse employment action in relation to the protected activity also may be introduced as circumstantial evidence of retaliation. However, whatever type of evidence is admitted, it is crucial that the evidence be linked back to the ultimate decisionmaker and, in particular, to the adverse employment decision that occurred. *Some vague notion of workplace misconduct disconnected from the adverse action is not probative of retaliation*" (emphasis added). Snell & Eskow, What Motivates the Ultimate Decisionmaker? An Analysis of Legal Standards for Proving Causation and Malice in Employment Retaliation Suits, 50 Baylor L. Rev. 381, 396 (1998).

The plaintiff "tendered nothing, direct or circumstantial, suggesting a retaliatory animus. To the contrary, the record, read as a whole, is more consistent with an employer's longstanding desire to improve an employee's behavior than with some sort of vengeful preoccupation." *Mesnick* v. *General Elec. Co.*, 950 F.2d at 828.

I would affirm the trial judge's directed verdicts on the plaintiff's claims against all four defendants.

---

[3]The plaintiff himself testified that he had brought grievances, lawsuits, or charges of misconduct against no less than nine different faculty members in his nine or ten years with the medical center.