# United States Court of Appeals
## For the First Circuit

Nos. 01-2131
       02-1434

HARRY YOHE,
Plaintiff, Appellant,

v.

PETER NUGENT; WORCESTER TELEGRAM AND GAZETTE;
KATE WALSH and NASHOBA PUBLICATIONS. INC.,
Defendants, Appellees,

and

WILLIAM MAY, CHIEF OF TOWNSEND POLICE DEPARTMENT,
TOWNSEND TRILOGY and CITY OF TOWNSEND,
Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Torruella and Howard, Circuit Judges.

---

Damon Scarano, for appellant.
Elizabeth A. Ritvo, with whom Jeffrey P. Hermes and Brown
Rudnick Berlack Israels LLP, were on brief, for appellees Kate
Walsh and Nashoba Publications.
Jonathan M. Albano, with whom Bingham Dana LLP, was on brief,
for appellees Peter Nugent and Worcester Telegram & Gazette
Corporation.
Stephen C. Pfaff, with whom Douglas I. Louison and Merrick,
Louison & Costello, were on brief for appellees William May and
City of Townsend.

---

February 26, 2003

---

**TORRUELLA**, **Circuit Judge**.  Appellant Harry Yohe is a retired member of the Army Green Berets.  In May of 1997, Yohe resided in Townsend, Massachusetts and was stationed at Fort Devens.  On the evening of May 11, 1997, police responded to a report of a domestic disturbance involving Yohe.  The police interviewed Yohe's spouse at the neighbor's residence and she told them that, Yohe was threatening suicide and had amassed an arsenal of weapons.  Yohe's wife informed police that her husband had been acting irrationally and had armed himself with two AK-47 rifles, a Kevlar helmet and 400 rounds of ammunition.  She also reported that Yohe, who was on antidepressants, had been drinking since the previous day and was home alone with his seventeen year-old son.

Townsend Police and Massachusetts State Police evidently took Mrs. Yohe's report very seriously, because they dispatched a small army to Yohe's house.  Thirty police vehicles, including a SWAT team and a hostage negotiator converged on the Yohe home, only to find that Yohe had left the residence.  Police later found Yohe at Fort Devens, where he was arrested at approximately 1:30 A.M. on May 12, 1997.

After his arrest at Fort Devens, Yohe was transported to Nashoba Deaconess Hospital for a medical evaluation.  He was then transferred to St. Elizabeth's hospital in Brighton for further treatment and psychiatric evaluation.  Although the record is less than clear on this point, it appears that both hospitals discharged

Yohe shortly after admitting him, finding no evidence of intoxication or suicidal ideation.

On May 13th and 14th, two local newspapers printed stories about the arrest. Peter Nugent of the <u>Worcester Telegram & Gazette</u> and Kate Walsh, a reporter for the <u>Townsend Times</u> published articles about the arrest, without identifying Yohe by name. The two articles were substantially similar and we reproduce the <u>Townsend Times</u> article in full here.

DOMESTIC SITUATION TURNS UGLY

TOWNSEND--Many local residents were alarmed Sunday night with the sight of up to 30 state police vehicles traveling through the streets of Townsend. Police Chief William May had called in the extra forces when a woman reported a drunk and suicidal husband in possession of deadly fire power and hundreds of rounds of ammunition.

The domestic dispute between husband and wife began at about 7 p.m. on Mother's Day, stated May. Police were called at approximately 8:30 p.m. when the woman reported that she and her children had left the house with a drunk and suicidal husband still inside. The unidentified woman alerted police of the presence of two AK47s and 500 rounds of ammunition in the house, with her husband identified as a former soldier connected with special forces units.

"He had been drinking all weekend," stated May. "She also told us that her older son was either in the house or on his way there . . . We determined that he was there."

With the unidentified man in custody by midnight, police confirmed that he had been drinking. May stated it was his belief that the man was suicidal. No charges have been brought against him.

The operation was secured at 4 a.m. Monday morning.

The Nugent and Walsh articles were published one and two days after Yohe's arrest, hospitalization and discharge. Each of

-3-

the articles was based entirely on interviews with Chief May. Nugent and Walsh had each interviewed May in the past, and finding him to be a credible source, did not conduct an independent investigation before publishing the articles. Consequently, neither article contained any information about Yohe's eventual discharge from the hospital, or about the results of any examinations he underwent. It is undisputed that the articles accurately recounted Chief May's statements to Nugent and Walsh.

As for May himself, his statements were based on the police incident report, which memorialized the telephone report and request for assistance by Yohe's spouse. There is no also no dispute about the accuracy of Chief May's statements regarding Yohe's spouse's domestic dispute report.

Yohe sued Nugent and the <u>Worcester Telegram & Gazette</u>, and Walsh of Nashoba Publications, Inc. [the "Newspaper defendants"] for defamation and intentional infliction of emotional distress. Yohe also sued Chief May for defamation and intentional infliction of emotional distress. Additionally, he brought an action against May and the town for a variety of alleged constitutional violations connected with Yohe's arrest and May's statements to the media. The district court granted summary judgment to the Newspaper defendants on the ground that the reports were either truthful or protected by the fair report privilege. The court also granted summary judgment for Chief May, finding that

-4-

his statements were not defamatory because they simply conveyed "information he received in his official capacity and which served as the basis for the arrest." Further, his statements could not give rise to a suit for intentional infliction for emotional distress because the statements were not extreme and outrageous. Yohe now appeals the district court's summary dismissal of his defamation and infliction of emotional distress claims.

### Discussion

We review the district court's grant of summary judgment for Chief May and the Newspaper defendants de novo. We affirm the district court's judgment only if there is no genuine issue of material fact and if the appellees are entitled to judgment as a matter of law. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002).

Defamation is the publication, either orally or in writing, of a statement concerning the plaintiff which is false and causes damage to the plaintiff. McAvoy v. Shufrin, 401 Mass. 593, 587 (1988). To establish a claim of defamation, a plaintiff must satisfy the following elements. First, the defamatory statement must "hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community, at least to his discredit in the minds of a considerable and respectable class in the community." Tartaglia v. Townsend, 19 Mass. App. Ct. 693, 696 (1985) (quotation omitted). Second, the

-5-

statement must have been to at least one other individual other than the one defamed. Brauer v. Globe Newspaper Company, 351 Mass. 53, 56 (1966). Third, where the speech is a matter of public concern, a defamation plaintiff must prove not only that the statements were defamatory, but also that they were false.[1] Dulgarian v. Stone, 420 Mass. 843, 847 (1995); see also Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986) (holding that where plaintiff is a private figure and newspaper articles are a matter of public concern, there is a "constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages"). Finally, the plaintiff must show that he suffered special damages and must set forth these damages specifically. Lynch v. Lyons, 303 Mass. 116, 119 (1939).

With that background in mind, we now analyze the statements of Chief May and the Newspaper defendants to determine whether any of these statements can support a claim of defamation or intentional infliction of emotional distress.

---

[1] Ordinarily, the standard of fault in defamation cases turns on whether the plaintiff is a private figure or a public official. New York Times Co. v. Sullivan, 376 U.S. 254 (1964). Here, there is some question about whether or not Yohe's former position as "second in command at Fort Devens Reserve Forces Training Area" elevates him into public official status. Nevertheless because we decide Yohe's defamation claims against the Newspaper defendants on grounds of privilege, we do not reach the issue of whether Yohe is a private figure for defamation purposes.

### A. Chief May's Statements

Yohe alleges that Chief May's statements defamed him and intentionally inflicted emotional distress. Specifically, Yohe challenged the following statements that May made to the press: (1) that Yohe "was a retired member of the Army Special Forces of Green Berets and has been trained as a sniper;" (2) that Yohe had "threatened to kill himself and was reported to be armed with several large caliber weapons;" and (3) "it was [May's] belief that [Yohe] was suicidal."

As the district court judge noted,

> Reading the newspaper articles in their entirety, it is clear that May was simply reporting information he received in his official capacity and which served as the basis for the arrest. He makes clear that the information was derived from witness statements, and qualifies his recitation of facts with phrases like "according to witnesses," "it was [my] belief," and "it was reported." While plaintiff challenges the veracity of the underlying information May gathered from witnesses, he does not refute that those facts were reported to May, or that they were the premise of his conduct.

Yohe v. May, No. CIV.A. 00-10802-RWZ, 2002 WL 924225 at *1 (D.Mass., March 14, 2002).

May's statements referring to Yohe's military background, to the fact that he was heavily armed and that he was in a disturbed mental state on May 11, 1997 amount to nothing more than unrefuted statements of fact. Although Yohe now challenges these statements, the fact is that most of them are either true or have

-7-

never been shown to be false.  Yohe carries the burden of showing that each allegedly defamatory statement is materially false. Dulgarian, 420 Mass. at 847; see also Phantom Touring Inc. v. Affiliated Publ'ns, 953 F.2d 724, 727 (1st Cir. 1992) (holding that "statements made by a media defendant must be provable as false before there can be defamation liability").

Moreover, other statements referring to Yohe's background could not -- even if they were proven false -- amount to defamatory language.  For instance, Yohe now claims that although he was a Green Beret, he did not receive "sniper training."  While this aspect of the articles may be inaccurate, inaccuracy by itself does not make a statement defamatory.  It is inconceivable that this inaccurate account of Yohe's Special Forces training could hold Yohe "up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community."  See Tartaglia, 19 Mass. App. Ct. at 696.

The only other statement Yohe characterizes as defamatory is the statement "May stated it was his belief that [Yohe] was suicidal."  Unlike the other challenged statements which recited basic facts about Yohe's background and his conduct on May 11, this statement plainly constitutes Chief May's opinion about Yohe's mental state the night of the arrest.  May's opinion was of obvious relevance to the reporters' stories because, as the Telegram article explained, Yohe "was arrested under a state law that allows

-8-

police to take into custody anyone who is considered at risk of harming himself."

To determine whether or not a statement is an opinion, a court "must 'examine the statement in its totality and in the context in which it was uttered or published. The court must consider all the words used . . . [and] must give weight to cautionary terms used by the person publishing the statement.' Finally, the court must consider all of the circumstances surrounding the statement." Lyons v. Globe Newspaper Co., 415 Mass. 258, 263 (1993), quoting Fleming v. Benzaquin, 390 Mass. 175, 180-81 (1983). Here, the qualified language of the statement ("it was his belief") makes clear that May was expressing his own opinion about Yohe's mental state on May 11 and 12, 1997.

Of course, the fact that a statement is an opinion does not automatically shield it from a defamation claim. After all, "expressions of 'opinion' may often imply an assertion of objective fact." Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990); Dulgarian, 420 Mass. at 849. Thus, a cause of action for defamation may still be sustained where an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion." Nat'l Ass'n of Gov't Employees, Inc. v. Central Broad. Corp., 379 Mass. 220, 227-28 (1979). Chief May's opinion, however, was based on disclosed nondefamatory facts. As the district court correctly noted, May "makes clear that the information was derived

from witness statements, and qualifies his recitation of facts with phrases like 'according to witnesses' . . . and 'it was reported.'" Yohe v. May, 2002 WL 924225 at *1. Since the articles establish that May's opinion was based on witness statements and reports he received, the "logical nexus between the facts and the opinion sufficiently apparent to render unreasonable any inference that the derogatory opinion was must have been based on undisclosed facts." Dulgarian, 420 Mass. at 850-51, quoting Lyons, 415 Mass. at 266. An "expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is." Id. Consequently, Chief May's opinion about Yohe's mental state is not actionable.

In sum, the statements challenged by Yohe all fall into one of three categories: (1) unrefuted statements of fact; (2) statements which -- although likely false -- could not reasonably be considered offensive to the average person in the community; and (3) statements of opinion based upon disclosed facts. As none of these types of statements provides a basis for a defamation cause of action, Yohe's defamation claim against Chief May fails.

Yohe also alleges that Chief May's statements are sufficient to find May liable for intentional infliction of emotional distress. This claim is premised on precisely the same facts as his defamation claim. To prevail, Yohe must show: (1)

-10-

that May intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that May's actions were the cause of Yohe's distress; and (4) that the emotional distress sustained by Yohe was severe. Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976) (citations and quotations omitted).

Two reporters asked Chief May why thirty police cruisers and a SWAT team descended on a residence in Townsend, Massachusetts. May explained, in the most professional manner possible, that the officers were dispatched to ensure a calm resolution in a domestic dispute involving a heavily armed and potentially suicidal ex-Green Beret. He provided the public with an accurate summary of the facts as they had been reported to him, and, without identifying Yohe by name, justified his decision to arrest him by explaining that he believed Yohe might be suicidal. May's conduct cannot in any way be described as "extreme and outrageous." Consequently, Yohe's emotional distress claim fails.

Finally, Yohe claims that Chief May made defamatory statements to other law enforcement officials about Yohe being suicidal and dangerous, and that these statements resulted in the false arrest, physical beating, invasion of privacy and warrantless search of Yohe's home. He claims that May's actions violated his

-11-

constitutional rights and seeks relief pursuant to 42 U.S.C. § 1983. These claims have been briefed by the parties and reviewed by this Court, and we find them to be without merit.

### B. The Newspaper Defendants

Yohe's claim against the Newspaper defendants is premised on the same facts and statements as his claim against Chief May. The district court granted summary judgment to the Newspaper defendants on the ground that, as a matter of law, the news account of Yohe's arrest was a privileged fair report of governmental conduct. We agree.

The fair report privilege "allows those who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such reports." ELM Medical Laboratory, Inc. v. RKO General Inc., 403 Mass. 779, 782 (1989). The purpose of the privilege is to ensure that publications may perform the important function of informing the public of actions taken by government agencies and officials. See Sibley v. Holyoke Transcript-Telegram Publ'g Co., 391 Mass. 468, 472 (1984). As set forth in ELM Medical,

> The [fair report privilege] recognizes that (1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate.

-12-

ELM Medical, 403 Mass. at 782 (internal quotations and citations omitted).

To qualify for the fair report privilege the report must be a fair and accurate portrayal of the official action.  The test is whether a reporter's "rough-and-ready summary" of an official action is "substantially correct."  Id. at 783.  "A statement is considered a fair report if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced."  Id.

The fair report privilege protects published reports of arrests by police.  Jones v. Taibbi, 400 Mass. 786, 796 (1987)("An arrest by an officer is an official action, . . . a report of the fact of the arrest or the charge of crime made by the officer in making or returning the arrest is therefore within the [fair report privilege].").  Thus, a newspaper's "publication of the fact that one has been arrested, and upon what accusation, is not actionable, if true." Thompson v. Globe Newspaper Co., 279 Mass. 176, 188 (1932).  Therefore, so long as a newspaper's "rough and ready summary" of the arrest is "substantially correct," the newspaper's report is protected by the privilege.  Cf. MiGi, Inc. v. Gannett Massachusetts Broadcasters, Inc., 25 Mass. App. Ct. 394, 396 (1988).

The Telegram & Gazette and Times articles fall squarely within this privilege.  The report of Chief May was clearly an

-13-

"official statement," and the information in the articles was expressly and repeatedly attributed to Chief May. There is no dispute that the articles in question faithfully and accurately recounted May's official statement; the articles were, at a minimum, a "substantially correct" summary of an official statement. There is also no evidence that the facts in either story were manipulated, enlarged or embellished upon by the reporters; had there been, the privilege might not apply. See Brown v. Hearst Corp., 54 F.3d 21, 25 (1st Cir. 1995); see also Restatement (Second) of Torts § 611 (2002) ("The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to anyone, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.").

The only question then is whether any inaccuracies contained in the articles should cause the defendants to lose the benefit of the privilege. Yohe now argues that material inaccuracies in the articles, as well as negligent reporting on the appellees' part should result in the newspapers losing the protection of the privilege. Specifically, Yohe argues that the fair report privilege is vitiated here because: (1) the articles inaccurately reported that he was drunk and suicidal at the time of his arrest; and (2) the Newspaper defendants were negligent and failed to conduct an independent investigation, which, Yohe

-14-

contends, would have caused them to discover that the hospitals had "exonerated" him of being intoxicated and suicidal.

The fair report privilege is not absolute. It is limited in scope to accurate (i.e. "substantially correct") reports of an official statement or action. Assuming arguendo that there are factual inaccuracies in the articles, the question here is whether the Times and Telegram & Gazette articles are still "accurate" within the meaning of the fair report privilege. Because Yohe does not dispute that the articles are faithful and accurate accounts of Chief May's actual statements, he is essentially asking us to conclude whether "accuracy" is to be determined by comparing a "fair report" article to the official statement upon which it is based, or by comparing it to the events which actually transpired. That is, can a newspaper reporter who "accurately" publishes the contents of an objectively inaccurate report of government activity still benefit from the fair report privilege?

To qualify as "fair and accurate" for purposes of the fair report privilege, an article reporting an official statement need only give a "rough-and-ready" summary of the official's report; it is not necessary that the article provide an accurate recounting of the events that actually transpired. Cf. ELM, 403 Mass. at 783. That is, "accuracy" for fair report purposes refers only to the factual correctness of the events reported and not to the truth about the events that actually transpired. Indeed, it is

-15-

well established that the fair report privilege "should not be forfeited even if the party making the report knew the statement to be false." MiGi, 25 Mass. App. Ct. at 397; Roketenetz v. Woburn Daily Times, Inc., 1 Mass. App. Ct. 156, 161-62 (1973) (holding that "at common law falsehood is insufficient to overcome [the fair report privilege]"); see also Restatement (Second) of Torts § 611 cmt. b (2002) ("The [fair report privilege] permits a person to publish a report of an official action or proceeding or of a public meeting that deals with a matter of public concern, even though the report contains what he knows to be a false and defamatory statement.").

The privilege might still be vitiated by misconduct on the newspapers' part, but that misconduct must amount to more than negligent, or even knowing, republication of an inaccurate official statement. To defeat the privilege, a plaintiff must either show that the publisher does not give a fair and accurate report of the official statement, or malice. However, as the Appeals Court of Massachusetts has pointed out, malice must "require some redefinition if it were taken not to comprehend knowing falsehood; perhaps repetition of such falsehood with a purpose to do the complainant maximum injury would still qualify as malice." MiGi, 25 Mass. App. Ct. at 397.

Yohe has provided no evidence of malice, no matter how the term is defined. Moreover, as noted above, it has never been

-16-

disputed that the newspaper stories accurately reported Chief May's statements. The district court was correct to find that the articles are protected by the fair report privilege. Consequently, we affirm its decision to grant summary judgment to the Newspaper defendants on the defamation claim.

As he did against Chief May, Yohe has also sued the Newspaper defendants for intentional infliction of emotional distress. Once again, Yohe's emotional distress claim is premised on precisely the same facts as his defamation claim; that is, on the publication of Chief May's official statements. However, a plaintiff cannot evade the protections of the fair report privilege merely by re-labeling his claim. Correllas v. Viveiros, 410 Mass. 314, 324 (1991) ("A privilege which protected an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort"); see also Hustler Magazine v. Falwell, 485 U.S. 46, 56-57 (1988) (holding that a plaintiff cannot make an end-run around the First Amendment by suing for emotional distress rather than defamation); Brown v. Hearst Corp., 54 F.3d 21, 27 (1st Cir. 1995) ("it is not imaginable that [a false light claim] could escape the same constitutional constraint as [a] defamation claim").

In short, while Chief May's statements regarding Yohe's arrest may have contained inaccuracies, and while the subsequent republication of those statements in local newspapers may have

perpetuated those inaccuracies and caused Yohe some distress, we cannot see how the challenged statements and articles constitute anything other than the legitimate and nondefamatory flow of information from a government official to an interested public.

**<u>Affirmed</u>**.