**Teresa MARTINEZ, Plaintiff,**

v.

**NEW ENGLAND MEDICAL CENTER HOSPITALS, INC., Defendant.**

**No. CIV.A. 01–12349–JLT.**

United States District Court,
D. Massachusetts.

March 3, 2004.

---

Paul F. Wood, Law Office of Paul F. Wood PC, Boston, MA, for Teresa Martinez, Plaintiff.

Ronald M. Jacobs, Matthew P. Poppel, Poppel & Associates, Boston, MA, for New England Medical Center, Inc., Defendant.

## MEMORANDUM

TAURO, District Judge.

Plaintiff Teresa Martinez ("Martinez") initiated this action against Defendant New England Medical Center Hospitals, Inc. ("NEMCH"), alleging violations of federal and state law for retaliatory discharge, termination in violation of public policy, invasion of privacy, intentional interference, and defamation.

Defendant's motion for summary judgment is now before this court.

### Background

NEMCH established an International Patient Center ("IPC") in or around 1996.[1] The IPC was designed to attract "international patients capable of paying full price for medical care."[2] Martinez began working as an employee in the IPC in or around August, 1997.[3] Her job responsibilities included "financial and registration coordination ... for international patients."[4] Part of Martinez's job was "making sure the patients she [was] coordinating ... [were] financially able to pay."[5]

According to NEMCH's written policies, the regular order of ensuring payment is to first provide an initial estimate to the patient, which the patient must pay for up front.[6] The actual charges are then delineated on an invoice after the services have been provided. IPC coordinators are authorized to provide up to a twenty-percent discount "from the total gross charges without specific approval from [NEMCH's Chief Financial Officer ('CFO') ]."[7]

---

1. Def.'s Local Rule 56.1 Statement ("Def.'s Statement of Undisputed Facts") ¶ 1.

2. *Id.*

3. *Id.* ¶ 2.

4. *Id.* ¶ 3. Martinez was given the job title of "International Patient Liaison" in or around early 2000. Pl.'s Local Rule 56.1 Concise Statement of Material Facts Precluding the Entry of Summ. J. for Def. ("Pl.'s Statement of Material Facts") ¶ 3.

5. Def.'s Statement of Undisputed Facts ¶ 12.

6. *Id.* ¶ 14.

7. *Id.*

Martinez understood NEMCH's policy required the IPC "to obtain 50% or 100% of the estimated cost on a case-by-case basis." [8] And, she knew that "if there were 'less than 80% in the door prior to the procedure[,]' she would have to go see the CFO of the Hospital." [9] Martinez also recognized that any discount in excess of twenty percent had to be approved by the CFO. [10] NEMCH claims that Martinez was terminated as a result of her failure to abide by these regulations.

In the spring of 2001, Martinez was acting as the patient liaison for an Ecuadoran patient in need of a bone-marrow transplant. [11] The procedure was estimated to cost $330,000. [12] Martinez faxed that estimate to either the patient or the patient's cousin. [13]

The patient was scheduled to start chemotherapy on April 23, 2001, but by April 11, 2001, Martinez had received only a $5,000 deposit for the treatment [14]. When asked by the bone marrow transplant coordinator if the patient was "all set" for the procedure, Martinez answered, "[i]f the question is if she is all set with the cost of the estimate[, the answer] is no." [15] Martinez, however, did not notify her supervisor, Wendy Leong–Lum ("Leong–Lum"), or NEMCH's CFO about the situation. [16]

A week before the patient was to undergo treatment, her family threatened to go to the press and say that she was denied care because she was unable to pay. [17] NEMCH's Chief Operating Officer ("COO"), Dr. Miller (the physician who was to perform the transplant) and the hospital's public affairs person went to see Martinez to find out the facts surrounding this patient. Martinez relayed to them the following: The patient, or her cousin, told Martinez that she had collected $25,000, "had somebody who was going to give $50,000" and "had undertaken fundraising initiatives." [18] Martinez responded that the patient "would have to provide [her] with the $75,000, a letter of intent of fundraising and that Martinez would take it from there." [19] The patient, or the cousin, then inquired about the possibility of a greater discount, to which Martinez answered that "only if the doctor offers something in addition to [the] 20%[,] will the Hospital consider [it,] . . . and . . . it[']s up to you if you want to speak to the physician." [20] Martinez then met with the patient, or her family, and discussed the possibility of her "approaching the physician directly about waiving his fees." [21] At some point during these discussions, the patient's cousin said

8. *Id.* ¶ 15.

9. *Id.* ¶ 16 (quoting NEMCH's Deps. Transcripts and Affs. in support of Summ. J., Ex. A ("Martinez Dep.") 258:14–19).

10. *Id.* ¶ 17.

11. *Id.* ¶ 11; Pl.'s Statement of Material Facts ¶ 23.

12. Def.'s Statement of Undisputed Facts ¶ 11.

13. *Id.*

14. *Id.* ¶ 20.

15. NEMCH's Exhibits in support of Summ. J. Ex. 2.

16. Def.'s Statement of Undisputed Facts ¶ 21.

17. *Id.* ¶ 22. Neither party has submitted facts that indicate whether NEMCH had actually told the patient that she would not receive treatment unless she could pay the full $330,000.

18. *Id.* ¶ 24.

19. *Id.* ¶ 25.

20. *Id.* ¶ 26 (internal quotations omitted).

21. *Id.*

to Martinez, "I mean, who has $330,000 to give."[22]

After Dr. Miller learned what had happened, he was "outraged" because the hospital could not "stop treatment now."[23] Leong–Lum later told Martinez that NEMCH's management was extremely upset about the situation.[24] On April 23, 2001, Leong–Lum made written notes about her communications concerning the incident for her file.[25] In addition, NEMCH's Vice President of General Services, James Carmody ("Carmody"), sent an email to the Chief Executive Officer and the COO explaining that:

> Theresa was not authorized to advise the patient as she did. The fact that she did this is very concerning. This is not the first time she has acted outside of her authority and she (in the past) has been at least verbally reprimanded. I think this is particularly egregious and may require HR intervention including the consideration of termination.[26]

In addition to Martinez's failure to abide by company policy, NEMCH also asserts that Martinez was fired for repeated tardiness. On June 29, 2000, Martinez had been placed on a Corrective Action Plan ("CAP") to address her tardiness issues.[27] She was placed on another CAP on August 7, 2000. The August CAP noted that since the June CAP, Martinez had "come in at least 10 minutes late on several occasions,"[28] and that Martinez's attendance would be carefully monitored for the next six months.[29] To help Martinez make it to work on time, NEMCH also adjusted her daily start time from 8:30 a.m. to 9:00 a.m.[30]

Martinez's attendance did not improve, despite the adjustment in her start time. On January 24, 2001, Martinez was suspended without pay for one day as a result of her continued tardiness.[31] Two days later she was given a final CAP, which listed all of the times since her August CAP that she had been late to work and included a Performance Improvement Plan that stated, "[a]ny further tardiness in excess of 3 occurrences within the Performance Improvement time frame of 3 months will result in immediate termination."[32]

Leong–Lum sent an email to Susan Perl on April 24, 2001, which noted that Martinez's anniversary from her last CAP would be on April 25, 2001 and that Martinez had been tardy on four separate occasions during that probationary period.[33] Leong–Lum also mentioned that she would be meeting with Carmody that afternoon and would discuss the situation with him.[34]

22. *Id.* ¶ 28 (internal quotations omitted). Despite this comment, Martinez claims that she did not believe that the patient was unable to pay for the procedure. *Id.* Aside from the $75,000 already promised, however, Martinez had no other information to indicate that the patient could "handle the financial aspect of the [bone marrow transplant]." *Id.* ¶ 29.

23. *Id.* ¶ 30.

24. *Id.*

25. *See* NEMCH's Exhibits in support of Summ. J. Ex. 3.

26. *Id.* Ex. 4.

27. *Id.* Ex. 7.

28. *Id.* Ex. 6.

29. *Id.*

30. Def.'s Statement of Undisputed Facts ¶ 35.

31. NEMCH's Exhibits in support of Summ. J. Ex. 9.

32. *Id.* Ex. 5.

33. *Id.* Ex. 12.

34. *Id.; see also id.* Ex. 10 (containing Leong–Lum's dated notes of the days that Martinez was tardy).

Martinez was fired from her position at NEMCH on April 26, 2001.[35] The written notice of her termination cites both her violation of IPC policy and her excessive tardiness as reasons for her dismissal.[36]

Martinez claims that those reasons are merely pretextual. Both in her complaint and in a subsequent affidavit, Martinez alleges that she made "numerous complaints to NEMCH management concerning discrimination against international patients at NEMCH."[37] She also alleges that she made "numerous complaints to NEMC[H] supervisory/managerial employees ... that [she] was being subject to unequal treatment ... because [she] was a single woman with [a] child."[38] Neither document recites specific details about any of these alleged complaints. In her deposition, moreover, Martinez admits that the most recent conversation she remembers having in which she complained about discrimination against certain international patients was in 2000.[39] And, Martinez cannot recall the last time she complained to a supervisor that she was being treated unequally due to being a single mother, though she thinks it was sometime in 2001.[40]

A wholly separate incident is the basis for several of Martinez's claims. A few months after her termination, Martinez and two of her friends initiated a phone call to Leong–Lum.[41] One of Martinez's friends posed as a representative of fictitious technology company interested in hiring Martinez, while Martinez and her other friend secretly listened to the call.[42] Leong–Lum expressed surprise that Martinez was applying for a new job because she thought that Martinez was moving out of state.[43]

When asked why Martinez had been terminated, Leong–Lum answered that Martinez had given an unauthorized discount to a patient.[44] She also noted that Martinez was frequently absent because she had a daughter who was constantly sick.[45] Additionally, Leong–Lum volunteered that Martinez did a great job, was very creative, and was a great person and friend.[46]

## Discussion

NEMCH has filed a motion for summary judgment. Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[47] Rule 56 mandates summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

---

35. *Id.* Ex. 13.

36. *Id.*

37. Compl. ¶ 10; Aff. of Teresa Martinez, submitted in support of Pl.'s Opp'n to Def.'s Mot. for Summ. J., Ex. A ("Martinez Aff.") ¶ 6. Specifically, Martinez has complained about discrimination against non-Middle Eastern patients.

38. Compl. ¶ 16; Martinez Aff. ¶ 12. Martinez has submitted no evidence of any written complaints concerning discrimination against international patients or against her as a single mother.

39. Martinez Dep. at 263:15–265:18.

40. *Id.* at 358:10–359:3.

41. Def.'s Statement of Material Fact ¶ 92.

42. *Id.*

43. *Id.* ¶ 96.

44. *Id.* ¶ 95.

45. *Id.* ¶ 97.

46. *Id.* ¶¶ 94, 97.

47. Fed.R.Civ.P. 56(c).

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[48]

The "party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue."[49] The party opposing summary judgment must produce specific evidence of a material factual dispute. The First Circuit has noted that "[a] genuine issue of material fact does not spring into being simply because a litigant claims that one exists. Neither wishful thinking nor 'mere promise[s] to produce admissible evidence at trial' ... nor conclusory responses unsupported by evidence ... will serve to defeat a properly focused Rule 56 motion."[50]

### A. Retaliatory Discharge

Martinez alleges claims of retaliatory discharge under both 42 U.S.C. § 2000e–3(a)[51] ("Title VII") and Mass. Gen. Laws ch. 151B § 4(4) ("chapter 151B, § 4(4)").[52] She alleges that NEMCH terminated her employment in retaliation for the complaints she made about NEMCH's discrimination against non-Middle Eastern patients and against her as a single mother.

In cases where there is "no direct evidence of retaliatory animus," both federal and state law require "the plaintiff [to] establish a prima facie case and prove that the defendant[']s[ ] stated reasons for the employment action were pretextual."[53] In such actions, the burden of persuasion always remains with the plaintiff, but the "shifting burden of production ... follows the tripartite formula of *McDonnell Douglas Corporation v. Green*."[54]

Under the *McDonnell Douglas* framework, a plaintiff must first make out a prima facie case of retaliatory discharge.[55] Next, the defendant must "articulate some legitimate, nondiscriminatory reason" for the employment action.[56] If the defendant is able to meet this burden, then "the plaintiff must prove that the articulated reason is a pretext."[57] To state a prima facie case of retaliatory discharge under Title VII, a plaintiff must show that: "(1) [she] engaged in a protected activity as an employee, (2)[she] was subsequently discharged from employment, and (3) there was a causal connection between the protected activity and the discharge."[58] Simi-

**48.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**49.** *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996) (quotations omitted).

**50.** *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990) (citations omitted).

**51.** 42 U.S.C. § 2000e–3(a) provides, in relevant part, that: "It shall be unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter."

**52.** Mass. Gen. Laws ch. 151B, § 4(4) provides that it is unlawful "[f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five."

**53.** *Mole v. Univ. of Mass.*, 58 Mass.App.Ct. 29, 787 N.E.2d 1098, 1107 (2003) (internal quotations omitted).

**54.** *Id.*; 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**55.** *Mole*, 787 N.E.2d at 1107.

**56.** *Id.* (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817).

**57.** *Id.*

**58.** *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir.1994).

larly, to succeed on a claim under chapter 151B § 4(4), "a plaintiff must establish the basic fact that [s]he was subjected to an adverse employment action because of [her] protected activity."[59]

Martinez has produced no evidence to suggest "direct retaliatory animus," so her claim must be analyzed under the *McDonnell Douglas* framework. Martinez is unable to satisfy the first prong of *McDonnell Douglas* because she does not present a prima facie case of retaliation. Martinez's alleged "protected activities" were the complaints she made concerning NEMCH's alleged discrimination against non-Middle Eastern patients and against her as a single mother. Neither of these actions constitutes a protected activity under Title VII or chapter 151B § 4(4). Martinez admits that her discrimination complaints concerned "discrimination based on ability to pay."[60] Discrimination based on one's ability to pay is not an "unlawful practice" under these sections.[61] Similarly, discrimination based on one's status as a single mother is not protected under either provision.[62]

Martinez also asserts that she is protected under Title VII because she had "a reasonable belief that the practice[s she] ... oppos[ed] violate[ ] Title VII."[63] Assuming, without deciding, that a reasonable belief is sufficient, she has still failed to make out a prima facie case of retaliation because she has not shown any causal connection between her complaints and her subsequent termination. Martinez cannot recall the last time prior to her termination that she complained about her treatment as a single mother.[64] Similarly, the last complaint she could recall making about discrimination against non-Middle Eastern patients was in 2000, months before she was terminated in April, 2001.[65]

Even if Martinez had established a prima facie case, her claim still fails. NEMCH has provided ample evidence of non-discriminatory reasons for Martinez's discharge. Martinez had a documented tardiness problem, for which she was placed on a corrective action plan and had been warned that further violations would result in her termination.[66] And, her termination was within a few days to a week of her violation of company policy.[67] Furthermore, NEMCH has offered evidence to show that not only did it not discriminate against Martinez for being a single

---

**59.** *Blockel v. J.C. Penney, Co., Inc.,* 337 F.3d 17, 26 (1st Cir.2003) (internal quotations omitted).

**60.** Def's Statement of Undisputed Facts ¶ 66.

**61.** 42 U.S.C. § 2000e(3) only protects an employee from retaliation because he "has opposed any practice made an unlawful employment practice by this subchapter ...." That subchapter does not include discrimination based on one's ability to pay for medical services. *See* 42 U.S.C. §§ 2000e to 2000e–17. Likewise, Mass. Gen. Laws ch. 151B, § 4 does not list discrimination based on one's ability to pay for medical services as an unlawful employment practice.

**62.** *See* 42 U.S.C. §§ 2000e to 2000e–17. Discrimination based on status as a single parent is not an lawful employment practice under this section. *See Gunther v. Gap, Inc.,* 1

F.Supp.2d 73, 77 (D.Mass.1998) (noting that parenthood is not a protected class under chapter 151B, § 4); *cf. Upton v. JWP Businessland,* 425 Mass. 756, 682 N.E.2d 1357, 1358 (1997) (holding that it was not a violation of public policy for an employer to discharge a single mother who refused to work newly imposed longer hours).

**63.** *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir.1994).

**64.** Martinez Dep. 358:10–359:3.

**65.** *Id.* 263:15–265:18.

**66.** NEMCH's Exhibits in support of Summ. J. Ex. 5.

**67.** *Id.* Ex. 13.

mother, but it actually altered her work hours to accommodate her needs.[68]

Because NEMCH satisfied its burden of production, in order for her claim to succeed, Martinez must provide evidence that NEMCH's reasons for her termination were merely pretextual. Martinez cannot met this burden. As noted above, Martinez has not produced evidence that demonstrates any causal connection between Martinez's complaints and her termination. Thus, Martinez's claims of retaliatory discharge must fail.

### B. Termination in Violation of Public Policy

In addition to her claim against NEMCH for retaliatory discharge, Martinez also asserts a claim for termination in violation of public policy, which is an exception to the at-will employment doctrine.[69] To succeed on such a claim, Martinez must show that she was terminated "for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)."[70] Martinez's claim is based on her assertion that she was terminated for asserting a legally guaranteed right, that is, "for reporting violations of NEMCH policies concerning patient rights, patient care, and billing and privacy issues."[71] Martinez, however, did not report these alleged violations to any regulatory body. She reported them only to NEMCH staff members and to friends.[72] The public-policy exception is not broad enough to encompass such complaints.[73] Solely internal issues cannot be the basis of a public-policy exception to the at-will doctrine.[74]

Plaintiff argues that internal complaints may be a sufficient basis for the public policy exception and cites *Shea v. Emmanuel College*[75] and *Upton v. JWP Businessland*[76] for that proposition. Plaintiff, however, fails to note that those cases concern internal complaints about criminal wrongdoing and explicitly distinguish themselves from non-criminal complaints.[77] Moreover, and perhaps most significantly, Martinez presents no evidence that her termination was in any way related to her

---

68. *Id.* Ex. 6; Def.'s Statement of Undisputed Facts ¶ 35.

69. *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State School*, 404 Mass. 145, 533 N.E.2d 1368, 1369 (1989).

70. *Id.* at 1371.

71. Compl. ¶ 36.

72. Def.'s Statement of Undisputed Facts ¶¶ 88–91.

73. *See Mistishen v. Falcone Piano Co., Inc.*, 36 Mass.App.Ct. 243, 630 N.E.2d 294, 295 (1994) (holding that internal complaints about deceptive trade practices were an insufficient basis for public policy exception).

74. *Smith–Pfeffer*, 533 N.E.2d at 1371–72.

75. 425 Mass. 761, 682 N.E.2d 1348 (1997).

76. 425 Mass. 756, 682 N.E.2d 1357 (1997).

77. *Shea*, 682 N.E.2d at 1350 ("The distinction of importance is between a discharge for an employee's internal complaint about company policies or the violation of company rules, for which liability may not be imposed, and an internal complaint made about the alleged violation of the criminal law for which we now decide that liability may be imposed.") The *Upton* court went to great lengths to distinguish between employee actions that are covered by the public-policy exception and those that are not. *Compare Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 589 N.E.2d 1241 (1992) ("nurse made internal reports of problems to high-ranking officials within hospital organization") (quoting *Upton*, 682 N.E.2d at 1359) *with DeRose v. Putnam Mgt. Co.*, 398 Mass. 205, 496 N.E.2d 428 (1986) ("at-will employee refused to give false testimony against coworker in criminal trial") (quoting *Upton*, 682 N.E.2d at 1359).

complaints. Any such assertion is merely speculative, and such speculation is not enough to survive a motion for summary judgment. Thus, her claim must fail.

## C. *Invasion of Privacy*

 Martinez contends that Leong–Lum's statements to Martinez's friend concerning the reasons for Martinez's termination violated her right to privacy.[78] Mass. Gen. Laws ch. 214, § 1B ("chapter 214, § 1B") provides, in relevant part, that: "A person shall have a right against unreasonable, substantial or serious interference with his privacy." In order for a plaintiff to succeed on an invasion of privacy claim, he must prove not only that the defendant unreasonably, substantially and seriously interfered with his privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so.[79]

To determine whether there has been a violation of chapter 214, § 1B in an employment setting, a court must "balance the employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure."[80] Statements that are "limited to issues regarding the plaintiff's fitness [as a potential employee do] not constitute an unreasonable interference with plaintiff's privacy."[81]

Leong–Lum's statements were made to someone that she reasonably believed to be a prospective employer. Her state-ments related only to issues of Martinez's job performance and did not include facts "of highly personal or intimate nature." Such communication falls outside of the scope of chapter 214, § 1B.[82] Martinez's claim, thus, fails as a matter of law.

## D. *Intentional Interference*

 Martinez also bases her intentional interference claim on the statements Leong–Lum made to Martinez's friend concerning the reasons for Martinez's termination. To prevail on a claim for intentional interference, a plaintiff must prove the following: "(1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendant[']s[ ] knowledge of the contract or business relationship; (3) the defendant[']s[ ] intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages."[83]

 Martinez's claim fails to satisfy several of these requirements. First, because Martinez's friend only posed as a prospective employer, Martinez cannot prove that there was an actual "contract or business relationship which contemplated economic benefit."[84] Second, Martinez has not offered any evidence that Leong–Lum acted with improper purpose or by improper means. Additionally, "[i]n response to an inquiry about a former employee, [a former employer has] a privilege, if not a duty, to speak the truth even if the disclosure of the facts might nega-

---

**78.** Leong–Lum's statements that Martinez had violated company policy, that Martinez was planning to move out of state, and that Martinez had a daughter who was sick constantly causing her to miss work are the basis for Martinez's invasion of privacy claim. Pl.'s Opp'n to Def.'s M. for Summ. J. at 11.

**79.** *Schlesinger v. Merrill Lynch.*, 409 Mass. 514, 567 N.E.2d 912, 913–916 (1991).

**80.** *Bratt v. IBM*, 392 Mass. 508, 467 N.E.2d 126, 135–36 (1984).

**81.** *Mulgrew v. City of Taunton*, 410 Mass. 631, 574 N.E.2d 389, 393 (1991).

**82.** *Schlesinger*, 567 N.E.2d at 913–916.

**83.** *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 668 N.E.2d 333, 338 (1996).

**84.** *Id.*

tively affect the subject's job prospects."[85] Third, Martinez cannot claim any damages from Leong–Lum's statements because, as noted above, there was no real business relationship with which Leong–Lum could have interfered. For all of the above reasons, Martinez's claim for intentional interference fails.

### E. Defamation

■ Defamation is "the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt."[86] To establish a claim of defamation, a plaintiff must satisfy the following elements:

First, the defamatory statement must hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair his standing in the community, at least to his discredit in the minds of a considerable and respectable class in the community. Second, the statement must have been to at least one other individual other than the one defamed. Third, where the speech is a matter of public concern, a defamation plaintiff must prove not only that the statements were defamatory, but also that they were

false. Finally, the plaintiff must show that he suffered special damages and must set forth these damages specifically.[87]

■ Massachusetts, however, recognizes both absolute and conditional privileges to a defamation claim.[88] One such privilege applies to employers: "An employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job."[89] And, "[o]nce an employer's conditional privilege is recognized, the burden shifts to the employee to prove that the privilege was abused."[90] To show such abuse, a plaintiff must "establish[ ] that the defendant knowingly or recklessly published the defamatory statement."[91]

■ Martinez argues that NEMCH made defamatory statements about her on at least two occasions, once when she was told of the reasons for her termination and once when Leong–Lum spoke to the apparent prospective employer.[92] Martinez's claim fails as both episodes are protected by the conditional privilege.[93]

**85.** Conway v. Smerling, 37 Mass.App.Ct. 1, 635 N.E.2d 268, 273 (1994). This privilege is lost only if the employer abuses it or acts with actual malice. Burns v. Barry, 353 Mass. 115, 228 N.E.2d 728, 731 (1967) ("Whether the statements to the assumed employer were true or false is immaterial if there was no abuse of the privilege and there was no showing of actual malice."). There is no evidence to indicate that Leong–Lum either abused her privilege or acted with malice.

**86.** Correllas v. Viveiros, 410 Mass. 314, 572 N.E.2d 7, 10 (1991).

**87.** Yohe v. Nugent, 321 F.3d 35, 40 (1st Cir. 2003) (internal citations omitted). Because Leong–Lum's statements were not a matter of public concern, the third element does not apply to this case.

**88.** See, e.g., Mulgrew v. City of Taunton, 410 Mass. 631, 574 N.E.2d 389, 391 (1991).

**89.** Bratt v. IBM, 392 Mass. 508, 467 N.E.2d 126, 129 (1984).

**90.** Elicier v. Toys "R" Us, Inc., 130 F.Supp.2d 307, 311 (D.Mass.2001).

**91.** Mulgrew, 574 N.E.2d at 392.

**92.** Pl's Opp'n to Def.'s M. for Summ. J. at 13.

**93.** Martinez argues that NEMCH lost its right to a conditional privilege because the reasons for Martinez's termination "were a pretext for unlawful retaliation." Pl's Opposition to Def.'s M. for Summ. J. at 13. This court, however, has found no unlawful retaliation, so NEMCH's conditional privilege remains intact.

As stated above, an employer enjoys a conditional privilege when it makes "defamatory statements concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." [94] And, a termination letter "is a reasonably necessary communication to serve [the defendant's] legitimate interest in providing its employee with the reasons for his termination." [95] Martinez has submitted no evidence that NEMCH abused this privilege.

What is more, NEMCH is shielded from the defamation claim because an employer who provides a reference to a potential employer is also protected by the conditional privilege.[96] And, Martinez has offered no evidence to suggest that NEMCH abused this privilege either. In fact, Martinez admitted that Leong–Lum made several complimentary remarks about her during the telephone call.[97] Such remarks are patently inconsistent with any malice.

Martinez's defamation claim also fails because she invited Leong–Lum's statements. In *Burns v. Barry*,[98] the plaintiff similarly had a friend pose as a prospective employer seeking references. In affirming the lower court's decision, the Massachusetts Supreme Judicial Court held: "[T]he oral statements made by [the defendant] to the plaintiff's associate were made in response to telephone inquiries initiated at the behest of the plaintiff, ...

and were conversations to which he listened .... Such statements as [the defendant] made to one purporting to be a 'prospective employer' were privileged." [99]

Finally, Martinez's defamation claims fail because she has not submitted evidence of any damages suffered by her. Damages are an essential element in a defamation claim, and a plaintiff must demonstrate the he "suffered special damages and must set forth these damages specifically." [100] Martinez has not met this burden. No real employment prospect was lost, and Martinez's feelings upon listening to Leong–Lum's statements are inadmissible.[101]

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is ALLOWED.

AN ORDER WILL ISSUE.

**94.** *Bratt*, 467 N.E.2d at 129.

**95.** *Axton–Cross Co., Inc. v. Blanchette*, No. 942764H, 1994 WL 879570, at *2 (Mass.Super. Oct. 17, 1994).

**96.** *Mulgrew*, 574 N.E.2d at 391–92 (holding that statements made by plaintiff's supervisor to hiring committee regarding plaintiff's past job performance were protected by a qualified privilege).

**97.** Leong–Lum had volunteered that Martinez did a great job, was very creative, and was a great person and friend. Def.'s Statement of Undisputed Facts ¶¶ 94, 97.

**98.** 353 Mass. 115, 228 N.E.2d 728 (1967).

**99.** *Id.* at 731.

**100.** *Yohe v. Nugent*, 321 F.3d 35, 40 (1st Cir. 2003).

**101.** *Burns*, 228 N.E.2d at 732.